UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

CATHY BUCH,                          :
                                     :
                 Plaintiff,            :
                                       :
               v.                   :
                                       :      23-cv-8854 (DEH)
MARIA ASUNCION ARAMBURUZABALA   :
LARREGUI, BEATRICE BALLINI,          :
JOACHIM CREUS, OLIVIER GOUDET,     :
PETER HARF, JOHANNES P. HUTH, ANNA  :
ADEOLA MAKANJU, SUE NABI, ISABELLE:
PARIZE, LUBOMIRA ROCHET, ROBERT     :
SINGER, and COTY INC.,                :
                     Defendants.          :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OF LAW IN SUPPORT
## OF DEFENDANTS' MOTION TO DISMISS

Scott D. Musoff
Lauren E. Aguiar
SKADDEN, ARPS, SLATE,
    MEAGHER & FLOM LLP
One Manhattan West
New York, New York 10001
Telephone: (212) 735-3000
Facsimile: (212) 735-2000
scott.musoff@skadden.com
lauren.aguiar@skadden.com

Paul J. Lockwood
(*pro hac vice* forthcoming)
SKADDEN, ARPS, SLATE,
    MEAGHER & FLOM LLP
One Rodney Square
920 N. King Street
Wilmington, Delaware 19801
Telephone: (302) 651-3000
Facsimile: (302) 651-3005
paul.lockwood@skadden.com

*Attorneys for Defendants*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................... ii

PRELIMINARY STATEMENT ............................................................................................. 1

STATEMENT OF FACTS ...................................................................................................... 3

ARGUMENT ........................................................................................................................... 7

I.   PLAINTIFF'S SECTION 14(a) CLAIM FAILS TO STATE A CLAIM
     BECAUSE THE COMPLAINT ALLEGES NEITHER A MATERIALLY
     MISLEADING STATEMENT/OMISSION NOR LOSS CAUSATION. ........................ 7

     A.   Plaintiff's Section 14(a) Claim Is Subject To Heightened Pleading
          Standards Under The PSLRA. ............................................................................... 8

     B.   Plaintiff Fails To Identify Any Materially False Statements As A Matter
          Of Law ................................................................................................................... 8

     C.   Plaintiff Cannot Establish Loss Causation As A Matter Of Law. ....................... 13

II.  PLAINTIFF'S PURPORTED DERIVATIVE CLAIM FOR BREACH OF
     FIDUCIARY DUTY SHOULD BE DISMISSED FOR FAILURE TO MAKE A
     DEMAND OR SUFFICIENTLY ALLEGE DEMAND FUTILITY. ............................. 15

     A.   Rule 23.1 Legal Standard. ................................................................................... 15

     B.   The Amended Complaint Fails To Allege Facts Sufficient To Demonstrate
          A Substantial Likelihood Of Liability ................................................................. 19

III. PLAINTIFF'S PURPORTED DERIVATIVE CLAIM FOR BREACH OF
     FIDUCIARY DUTY ALSO FAILS TO STATE A CLAIM UNDER RULE
     12(B)(6) ................................................................................................................... 25

CONCLUSION ..................................................................................................................... 25

## TABLE OF AUTHORITIES

**Cases**                                                                              **Page**

*In re 3COM Corp. Shareholders Litigation,*
No. C.A. 16721, 1999 WL 1009210 (Del. Ch. Oct. 25, 1999) .................................. 20, 21

*Allred ex rel. Aclaris Therapeutics, Inc. v. Walker,*
No. 19 Civ. 10641 (LJL), 2021 WL 5847405 (S.D.N.Y. Dec. 9, 2021) ......................... 15

*Alpha Capital Anstalt v. Schwell Wimpfheimer & Associates LLP,*
No. 17 Civ. 1235 (GHW), 2019 WL 1436993 (S.D.N.Y. Mar. 30, 2019) ........................ 2

*In re American International Group, Inc. Derivative Litigation,*
700 F. Supp. 2d 419 (S.D.N.Y. 2010),
*aff'd,* 415 F. App'x 285 (2d Cir. 2011) ............................................................ 21

*Aronson v. Lewis,*
473 A.2d 805 (Del. 1984) ............................................................................. 15

*Binn v. Bernstein,*
No. 19 Civ. 6122 (GHW) (SLC), 2020 WL 4550312
(S.D.N.Y. July 13, 2020), *report and recommendation adopted,*
2020 WL 4547167 (S.D.N.Y. Aug. 6, 2020) ................................................... 16

*Bisel v. Acasti Pharma, Inc.,*
No. 21 Civ. 6051 (KPF), 2022 WL 4538173 (S.D.N.Y. Sept. 28, 2022) ................... 9, 11

*Bond Opportunity Fund v. Unilab Corp.,*
87 F. App'x 772 (2d Cir. 2004) ..................................................................... 8

*Brautigam v. Blankfein,*
8 F. Supp. 3d 395 (S.D.N.Y. 2014),
*aff'd sub nom. Brautigam v. Dahlback,* 598 F. App'x 53 (2d Cir. 2015) ........................ 16

*Brehm v. Eisner,*
746 A.2d 244 (Del. 2000) .................................................... 16, 20, 22, 23, 24

*In re Citigroup Inc. Shareholder Derivative Litigation,*
964 A.2d 106 (Del. Ch. 2009) ................................................................ 15, 19

*In re Cornerstone Therapeutics Inc., Shareholder Litigation,*
115 A.3d 1173, 1179-80 (Del. 2015) ............................................................ 19

*Espinoza ex rel. JPMorgan Chase & Co. v. Dimon,*
797 F.3d 229 (2d Cir. 2015) ......................................................................... 15

*Espinoza v. Zuckerberg,*
124 A.3d 47 (Del. Ch. 2015) ........................................................................ 21

*In re EZCORP Inc. Consulting Agreement Derivative Litigation*,
    130 A.3d 934 (Del. Ch. 2016) ........................................................................ 16

*F5 Capital, a Cayman Islands Corp. v. Pappas*,
    Civ. No. 14 Civ. 9356 (AT), 2016 WL 900389 (S.D.N.Y. Feb. 17, 2016),
    *aff'd sub nom. F5 Capital v. Pappas*, 856 F.3d 61 (2d Cir. 2017). ................ 17

*Feuer ex rel. CBS Corp. v. Redstone*,
    No. 12575-CB, 2018 WL 1870074 (Del. Ch. Apr. 19, 2018) ......................... 20

*Furlong Fund LLC v. VBI Vaccines, Inc.*,
    No. 14-Cv-9435 (SHS), 2016 WL 1181710 (S.D.N.Y. Mar. 25, 2016) ............ 8, 11

*Ganino v. Citizens Utilities Co.*,
    228 F.3d 154 (2d Cir. 2000) ............................................................................ 3

*General Electric Co. ex rel. Levit v. Cathcart*,
    980 F.2d 927 (3d Cir. 1992) .......................................................................... 14

*In re Goldman Sachs Group, Inc. Shareholder Litigation*,
    No. 5215-VCG, 2011 WL 4826104 (Del. Ch. Oct. 12, 2011) ........................ 20

*Grace v. Rosenstock*,
    228 F.3d 40 (2d Cir. 2000) ............................................................................ 13

*Greenlight Cap., L.P. v. Apple, Inc.*,
    No. 13 Civ. 900 (RJS), 2013 WL 646547 (S.D.N.Y. Feb. 22, 2013) ............ 9, 11, 12

*Kandell ex rel. FXCM, Inc. v. Niv*,
    No. 11812-VCG, 2017 WL 4334149 (Del. Ch. Sept. 29, 2017) ..................... 21, 23

*Kates v. Beard Research, Inc.*,
    No. 1480-VCP, 2010 WL 1644176 (Del. Ch. Apr. 23, 2010) ....................... 19

*Kernaghan v. Franklin*,
    No. 06 Civ. 1533 (LTS)(MHD), 2008 WL 4450268
    (S.D.N.Y. Sept. 29, 2008) ............................................................................. 15

*Lebanon County Employees' Retirement Fund v. Collis*,
    No. 2021-1118-JTL, 2022 WL 17841215 (Del. Ch. Dec. 22, 2022) ............. 16

*Louisiana Municipal Police Employees Retirement System v. Pandit*,
    No. 08 Civ. 7389 (LTS), 2009 WL 2902587 (S.D.N.Y. Sept. 10, 2009) ........ 19

*Malpiede v. Townson*,
    780 A.2d 1075 (Del. 2001) ............................................................................ 18

iii

*McMillan v. Intercargo Corp.*,
    768 A.2d 492 (Del. Ch. 2000).........................................................................25

*Olkey v. Hyperion 1999 Term Trust, Inc.*,
    98 F.3d 2 (2d Cir. 1996) ...............................................................................11

*Pickett ex rel. Teledoc Health, Inc. v. Gorevic*,
    No. 19 Civ. 5875 (GHW) (BCM), 2021 WL 4927061
    (S.D.N.Y. Mar. 26, 2021), *report and recommendation adopted sub nom.*
    *Pickett v. Teladoc Health, Inc.*, No. 19 Civ. 5875 (GHW), 2021 WL
    4239176 (S.D.N.Y. Sept. 17, 2021) ................................................. 16, 17, 19, 20, 21, 23

*Pierce v. Better Holdco, Inc.*,
    No. 22 Civ. 4748(AT), 2023 WL 6386920 (S.D.N.Y. Sept. 29, 2023)......................17, 19

*Resnik v. Swartz*,
    303 F.3d 147 (2d Cir. 2002)............................................................................8

*Rubenstein ex rel. Jefferies Financial Group Inc. v. Adamany*,
    No. 22-2794, 2023 WL 6119810 (2d Cir. Sept. 19, 2023) ................................. 1, 7, 13, 14

*Seinfeld v. Slager*,
    No. 6462-VCG, 2012 WL 2501105 (Del. Ch. June 29, 2012) ........................................21

*Shaev v. Adkerson*,
    No. 10436-VCN, 2015 WL 5882942 (Del. Ch. Oct. 5, 2015)........................................21

*Silberstein v. Aetna, Inc.*,
    13 Civ. 8759 (AJN), 2014 WL 1388790 (S.D.N.Y. Apr. 9, 2014). .................................14

*Smykla v. Molinarol*,
    85 F.4th 1228 (7th Cir. 2023).....................................................................9, 10

*Staehr v. Mack*,
    No. 07 Civ. 10368 (DAB) 2011 WL 1330856 (S.D.N.Y. Mar. 31, 2011) .......................18

*Stone v. Ritter*
    911 A.2d 362 (Del. 2006) ..............................................................................17

*Suez Equity Investors, L.P. v. Toronto-Dominion Bank*,
    250 F.3d 87 (2d Cir. 2001)............................................................................13

*In re Trinsum Group, Inc.*,
    466 B.R. 596 (Bankr. S.D.N.Y. 2012)...............................................................18

*Tully v. Mott Supermarkets, Inc.*
    337 F. Supp. 834 (D.N.J. 1972) ........................................................ …………15

iv

*United Food & Commercial Workers Union & Participating Food Industry*
    *Employers Tri-State Pension Fund v. Zuckerberg*,
    262 A.3d 1034 (Del. 2021) ...................................................................... 3, 16, 17

*United States ex rel. Foreman v. AECOM*,
    19 F.4th 85 (2d Cir. 2021), *cert. denied*, 142 S. Ct. 2679 (2022) ...................................... 2

*Vides v. Amelio*,
    265 F. Supp. 2d 273 (S.D.N.Y. 2003) ........................................................ 8, 9

*White v. Panic*,
    783 A.2d 543 (Del. 2001) ........................................................................ 19, 24

*Witchko ex rel. American Realty Capital Properties, Inc. v. Schorsch*,
    No. 15 Civ. 6043 (AKH), 2016 WL 3887289 (S.D.N.Y. June 9, 2016) .......................... 14

*Zucker v. Andreessen*,
    No. 6014-VCP, 2012 WL 2366448 (Del. Ch. June 21, 2012) ........................................ 20

**Statutes and Rules**

15 U.S.C. § 78n(a) ........................................................................................ 7, 8, 14

15 U.S.C. § 78u-4(b) ......................................................................................... 8

Fed. R. Civ. P. 9(b) ......................................................................................... 1, 25

Fed. R. Civ. P. 12(b)(6) ..................................................................................... 1, 25

Fed. R. Civ. P. 23.1 .......................................................................... 1, 2, 12, 15, 16, 25

17 C.F.R. § 229.402 ................................................................... 1, 4, 6, 7, 9, 10, 11

17 C.F.R. § 240.14a-9(a) ..................................................................................... 7

Del. Code Ann. tit. 8, § 102(b)(7) ......................................................................... 17, 18

Del. Code Ann. tit. 8, § 141(a) ............................................................................. 15

Del. Code Ann. tit. 8, § 220 ............................................................................... 24, 25

Coty Inc. ("Coty" or the "Company"), Maria Asuncion Aramburuzabala Larregui, Beatrice Ballini, Joachim Creus, Olivier Goudet, Peter Harf, Johannes P. Huth, Anna Adeola Makanju, Sue Nabi, Isabelle Parize, Lubomira Rochet and Robert Singer (collectively, "Defendants") respectfully submit this memorandum in support of their motion to dismiss the Amended Complaint (ECF No. 46 ("Amended Complaint")) with prejudice pursuant to Rules 9(b), 12(b)(6) and 23.1 of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995 ("PSLRA").

## PRELIMINARY STATEMENT

Plaintiff takes issue with a compensation package that the Coty board—in its legally entitled discretion—determined to pay its CEO and adequately disclosed to its shareholders, who thereafter approved the compensation and re-elected the directors by a large majority.  In so doing, the Amended Complaint contorts the federal securities laws and dodges the procedural requirements for a derivative lawsuit in an attempt to lure this Court into taking the drastic and unprecedented step of nullifying the election of Coty's board.  The Amended Complaint makes this extraordinary request even though it *concedes* that no economic loss was caused here.  That concession forecloses Plaintiff's ability to plead loss causation and is an independent basis for dismissal, as recently made clear by the Second Circuit in *Rubenstein ex rel. Jefferies Fin. Grp. Inc. v. Adamany*, No. 22-2794, 2023 WL 6119810, at *2 (2d Cir. Sept. 19, 2023).

Coty's CEO, one of the most successful CEOs in the beauty industry, is highly compensated.  However, it is black letter law that the board of directors of a Delaware corporation—not individual shareholders—determines executive compensation.  Moreover, here, Coty's public filings thoroughly disclosed the CEO's compensation in full compliance with Item 402 of Regulation S-K, 17 C.F.R. § 229.402 ("Item 402").  Coty's 2023 annual proxy statement, issued on September 21, 2023 (the "Proxy") included twenty pages of *detailed* disclosures relating

to the compensation of the Company's executives, including CEO Sue Nabi ("Ms. Nabi").[1]  As disclosed, the board approved of and designed Ms. Nabi's compensation to significantly compensate her for an impressive three-year plan that has transformed the trajectory of the Company and to ensure the continuation of Coty's momentum under her leadership for its next phase of growth.[2]  A majority of shareholders also approved Ms. Nabi's compensation in advisory votes held at each of the shareholder meetings over the last three years.

This Court offered Plaintiff the opportunity to amend the Complaint in the face of Defendants' previously filed motion to dismiss and stated that "Plaintiff will not be given any further opportunity to amend the Complaint to address issues raised by the motion to dismiss." (ECF 45.)  However, rather than substantively address Defendants' arguments, Plaintiff simply added cursory references to subsections of SEC regulations and made other cosmetic changes. That is not enough to avoid dismissal.  Plaintiff continues to fail to sufficiently allege—under the applicable heightened pleading standard—that the Proxy contains any misleading statement or material omission.  Rather, the Amended Complaint cites block quotes from the Proxy out of context and states that they violate various subsections of Securities and Exchange Commission ("SEC") rules.  The Amended Complaint now admits that there is no loss causation, which is reason alone for dismissal.

---

[1]  The Proxy is attached as Exhibit A to the Declaration of Scott D. Musoff ("Musoff Decl.").  The Court may consider this document in connection with this motion to dismiss because it is both integral to and incorporated by reference into the Amended Complaint.  *See, e.g.*, *United States ex rel. Foreman v. AECOM*, 19 F.4th 85, 107-08 (2d Cir. 2021), *cert. denied*, 142 S. Ct. 2679 (2022).

[2]  The terms of the 2023 compensation package were also disclosed contemporaneously with their negotiation in Coty's Form 8-K, filed May 4, 2023.  (Musoff Decl., Ex. B).  "[O]n a motion to dismiss the Court can consider statements made in a company's public filings with the SEC." *Alpha Cap. Anstalt v. Schwell Wimpfheimer & Assocs. LLP*, No. 17 Civ. 1235 (GHW), 2019 WL 1436993, at *6 (S.D.N.Y. Mar. 30, 2019).

The Amended Complaint's questioning of the directors' adherence to their fiduciary duties is equally devoid of merit.  It is fundamental Delaware law that a shareholder may not usurp the authority of the board without first meeting exacting pleading requirements.  Specifically, a shareholder must either make a demand on the board, or plead with particularity that making such a demand would be futile.[3]  Plaintiff here has done neither.  The jumbled and illogical string of accusations involving Ms. Nabi's compensation is not tethered to any legal entitlement to relief.  The Amended Complaint's boilerplate allegations of demand futility are entirely lacking merit.  For the following reasons, the Amended Complaint should be dismissed in entirety with prejudice.

## STATEMENT OF FACTS

Coty is a publicly listed Delaware corporation with stock traded on the New York Stock Exchange (and on Euronext Paris) and is engaged in manufacturing, distributing, marketing and selling various beauty products.  (AC ¶ 4.)  Cathy Buch ("Plaintiff") alleges she has been a shareholder of Coty since December 3, 2021.  (*Id.* ¶ 3.)

On July 1, 2020, Coty announced the planned hire of Ms. Nabi as its CEO.  (Musoff Decl., Ex. C, Coty Form 8-K, filed July 1, 2020.)  Ms. Nabi commenced employment as CEO on September 1, 2020, on which date the Company's stock traded at a near 16-week low of $3.48.[4]  A year prior in September of 2019, Coty's stock traded between $9.01 and $10.81.  The onset of COVID-19 had a significant impact on the Company's financial stability, making a new CEO's

---

[3]   "For a stockholder to divest the directors of their authority to control the litigation asset and bring a derivative action on behalf of the corporation, the stockholder must (1) make a demand on the company's board of directors or (2) show that demand would be futile."  *United Food & Com. Workers Union & Participating Food Indus. Empls.  Tri-State Pension Fund v. Zuckerberg* ("*Zuckerberg*"), 262 A.3d 1034, 1047 (Del. 2021) (quotations omitted); Fed. R. Civ. P. 23.1.

[4]   The Court may consider "well-publicized stock prices without converting [a] motion to dismiss into [one] for summary judgment."  *Ganino v. Cit. Utils. Co.*, 228 F.3d 154, 166 n.8 (2d Cir. 2000).

decision to join on a complicated one.  Since September 2020, however, "[u]nder the leadership of Sue Nabi, Coty has made significant progress against its strategic objectives . . . reclaiming the Company's status as a global beauty powerhouse."  (Proxy at 1.)  The Company delivered results "in-line to ahead of expectations" in the twelve consecutive quarters since 2020, (*id*) and its stock price rose during that period, reaching $12.28 on September 21, 2023, the date of the Proxy.

Upon hiring Ms. Nabi, the Company announced that her compensation would include a base salary of €3,000,000 and a sign-on grant of 30,000,000 Restricted Stock Units ("RSUs") settled in shares of the Company's Class A Common Stock.  (Ex. C at 2.)  These shares would vest as to 10,000,000 shares on each of August 31st of 2021, 2022 and 2023, subject to Ms. Nabi's employment with the Company through the applicable vesting date.  (*Id.*)  The RSUs were granted on June 30, 2021 and were properly disclosed both contemporaneously and in the Summary Compensation Table of Coty's 2021 proxy statement at a value of $280,200,000.[5]  (Musoff Decl., Ex. D at 43 (the "2021 Proxy").)  Pursuant to the terms of this grant, 10,000,000 shares vested on August 31, 2021 with a fair value at the time of vesting of $97,700,000 (Musoff Decl., Ex. E at 43 (the "2022 Proxy")), and 10,000,000 shares vested on August 31, 2022 at a fair value at the time of vesting of $75,100,000 (Proxy at 43.)[6]  This compensation "was based in large measure on

---

[5]  "The fair value of all equity awards is based on the closing price of [Coty's] common stock," (Proxy at 46-47) which at that time was increasing due in part to Ms. Nabi's efforts.  On July 1, 2020, when the forthcoming grant was announced, Coty's stock closed at $4.32 and on June 30, 2021, when the grant was actually made, Coty's stock price closed at $9.34.  That the stock price more than doubled directly correlated to the value of the grant.

[6]  The Amended Complaint improperly double counts the stock award *granted* to Ms. Nabi in 2021 and the amounts that *vested* in 2022 and 2023 as well as the stock award *granted* in 2023 with the amounts scheduled to *vest* from 2024 to 2030.  (AC ¶ 19.)  Ms. Nabi's compensation did not "exceed[] $900 million" from 2021 to 2023.  (*Id.*)  In accordance with Item 402(c)(1)-(2)(vi), the full amount of the grant was disclosed in the Summary Compensation Table in the year of grant and the amounts vested separately disclosed in the Stock Vested table in the year of vesting.  RSUs and Performance RSUs ("PRSUs") are not additional compensation and have no monetary value

*(cont'd)*

competitive benchmarking and [Ms. Nabi's] experience levels, industry expertise and her expected future contributions to the Company's transformation." (2021 Proxy at 35.)  Moreover, the sign-on stock grant was made "to align Ms. Nabi's interests with those of our shareholders and to motivate her stewardship of the Company's strategy over the longer-term." (*Id.*).  Under this alignment of incentives, Ms. Nabi's compensation was tied to Coty's performance.  Therefore, although Ms. Nabi benefited when the Company did well under her leadership, at the time of negotiation she was taking on risk that the Company would perform poorly.

The shareholders strongly backed the Board's compensation decision.  Coty's majority shareholder agreed to contribute 50% of the stock-based grant awarded to Ms. Nabi.  (2021 Proxy at 35.)  The shareholders reviewed and approved the Company's executive compensation arrangements in "say-on-pay" advisory votes at a rate of 77.4% in 2021 (2022 Proxy at 37) and 77.8% in 2022 (Proxy at 37).

On May 4, 2023, the Company and Ms. Nabi entered into an amendment to her employment agreement to provide for new compensation arrangements effective July 1, 2023. (Proxy at 33.)  Those arrangements included an annual performance-based cash bonus amounting to between €0 and €6,000,000, a grant of 10,416,667 RSUs scheduled to vest on a pre-determined schedule between September 1, 2024 and September 1, 2028 and an annual grant of 2,083,333 PRSUs to be made each year from 2023 to 2027.  (*Id.*)  The PRSUs are eligible to vest on the third anniversary of the grant date of the award based on achievement of certain three-year performance-based targets, implemented in part due to prior shareholder say-on-pay votes.  (*Id.* at 37.)  Indeed, this new compensation arrangement was designed to reflect the Company's "comprehensive re-

---

to the recipient unless and until they vest.  Defendants pointed out this error in their original motion to dismiss but Plaintiff, rather than fixing it, compounded her miscalculation.

assessment of our executive compensation principles . . . with a focus on introducing performance-based metrics for both short-term and long-term incentives." (*Id.*)

Coty filed the Proxy on September 21, 2023, in advance of the Company's November 2, 2023 shareholder meeting, soliciting a shareholder vote on two proposals relevant here—an election of each nominee for director to Coty's Board (Proxy at 21), and an advisory resolution approving the compensation of the Company's named executive officers, otherwise known as a "say-on-pay" vote (*Id.* at 29-30). In addition, the Proxy contained numerous disclosures relating to the solicited votes, including those required by Item 402. Item 402(b)(1) requires companies to "[d]iscuss the compensation awarded to, earned by, or paid to the named executive officers," including "[h]ow the registrant determines the amount (and, where applicable, the formula) for each element to pay." 17 C.F.R. § 229.402(b)(1)(v). Item 402(c) further requires disclosure of executive compensation in table form "for each of the registrant's last three completed fiscal years." 17 C.F.R. § 229.402(c)(1)-(2)(vi). Thus, companies must provide, *inter alia*, a narrative analysis of compensation granted to executive officers and a corresponding summary table.

As required, the Proxy contains a Compensation Discussion and Analysis, commonly referred to as a CD&A, at pages 29-38 explaining each of the elements of compensation for the named executive officers, with a peer group analysis at page 36 and a Summary Compensation Table at pages 38-39. (Proxy at 29-39.) The Proxy also details executive compensation via a Grants of Plan-Based Awards Table at page 40, narrative disclosures with respect to each of the above-mentioned tables at pages 40-41, an Outstanding Equity Table at page 42, an Option Exercises and Stock Vested Table at page 43, information about pay required in the event of termination at pages 43-45, materials comparing pay and performance at pages 46-47 and graphical representations of total compensation at pages 48-49. (*Id.* at 40-49.) In sum, the Proxy

contains twenty full pages of detailed, thorough disclosures relating to executive compensation compliant with Item 402 and other applicable regulations.

Coty held its shareholder meeting on November 2, 2023, and the shareholders approved executive compensation in the say-on-pay vote by a 74.4% margin and the shareholders also elected each director slated for a vote by similar majorities.  (Musoff Decl., Ex. H, Coty Form 8-K, filed Nov. 8, 2023.)

## ARGUMENT

I.   **PLAINTIFF'S SECTION 14(A) CLAIM FAILS TO STATE A CLAIM BECAUSE THE COMPLAINT ALLEGES NEITHER A MATERIALLY MISLEADING STATEMENT/OMISSION NOR LOSS CAUSATION.**

Plaintiff fails to state a claim under Section 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(a), ("Section 14(a)") with respect to any of the five disclosures in the Proxy that she challenges.  Section 14(a) states that "[i]t shall be unlawful for any person . . . in contravention of such rules and regulations as the Commission may prescribe . . . to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security."  15 U.S.C. § 78n(a)(1).  Rule 14a-9 prohibits any solicitation "made by means of any proxy statement . . . containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. § 240.14a-9(a).  Thus, "a plaintiff must plausibly allege that (1) a proxy statement contained a material misstatement or omission, which (2) caused the plaintiff injury, and (3) the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction."  *Rubenstein ex rel. Jefferies Fin. Grp. Inc. v. Adamany*, No. 22-2794, 2023 WL 6119810, at *2 (2d Cir. Sept. 19, 2023) (quotation omitted).

A.      **Plaintiff's Section 14(a) Claim Is Subject To Heightened Pleading Standards Under The PSLRA.**

Plaintiff's Section 14(a) claim is subject to heightened pleading standards under the PSLRA.  In addition to the ordinary requirement that a plaintiff must plead non-speculative and plausible factual allegations, as opposed to mere legal conclusions, the PSLRA requires plaintiffs to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the [Plaintiff] shall state with particularity all facts on which the belief is formed."  15 U.S.C. § 78u-4(b)(1).  Regardless of whether a plaintiff raises allegations sounding in fraud or negligence, "[t]he PSLRA's pleading requirements as to misleading statements and omissions apply to Section 14(a) claims."  *Furlong Fund LLC v. VBI Vaccines, Inc.*, No. 14 Civ. 9435 (SHS), 2016 WL 1181710, at *3 (S.D.N.Y. Mar. 25, 2016).

B.      **Plaintiff Fails To Identify Any Materially False Statements As A Matter Of Law.**

A *sine qua non* of a Section 14(a) claim is "a proxy statement [that] contained a material misrepresentation or omission."  *Bond Opportunity Fund v. Unilab Corp.*, 87 F. App'x. 772, 773 (2d Cir. 2004).  In an omissions case like this, "[d]isclosure of an item of information is not required, however, simply because it may be relevant or of interest to a reasonable investor.  For an omission to be actionable, the securities laws must impose a duty to disclose the omitted information."  *Resnik v. Swartz*, 303 F.3d 147, 154 (2d Cir. 2002).  Moreover, the bare assertion that a proxy statement is "confusing" is insufficient to state a claim under Section 14(a).  *See Vides v. Amelio*, 265 F. Supp. 2d 273, 280 (S.D.N.Y. 2003) (dismissing Section 14(a) claim where the complaint alleged merely that the proxy's compensation disclosures were made in a "confusing manner" and were "incomprehensible to the Company's stockholders.").  Indeed, "plaintiffs must do more than say that the statements . . . were false and misleading; they must demonstrate with

specificity why and how that is so." *Bisel v. Acasti Pharma, Inc.*, No. 21 Civ. 6051 (KPF), 2022 WL 4538173, at *6 (S.D.N.Y. Sept. 28, 2022). "[M]erely append[ing] the word 'misleading' to statements made in [a] Proxy" is insufficient as a matter of law. *Id.* at *11; *see Smykla v. Molinaroli*, 85 F.4th 1228, 1235 (7th Cir. 2023) (dismissing complaint that "contain[ed] long block quotes from the proxy statement but d[id] not explain why those block quotes (and defendants' alleged omissions) [we]re misleading, leaving the reader to puzzle over the allegations.")

Plaintiff identifies five Proxy disclosures that she purports to challenge. As described below, Plaintiff fails to establish how any of the challenged disclosures could be considered misleading and relies entirely on information taken from the very Proxy she challenges.[7] *See Vides*, 265 F. Supp. 2d at 280 (proxy complied with SEC regulations on compensation when plaintiff admitted "'the allegations in [the complaint] are drawn from the proxy statement' itself.")

*First*, the Amended Complaint claims that the Proxy is misleading because the total compensation for Ms. Nabi from 2021 to 2023 is excessive, which "exacerbates the confusing misdisclosures." (AC ¶ 19.) But Plaintiff does not and cannot allege that the amount of compensation disclosed for Ms. Nabi is inaccurate. The Proxy contains substantial detail with respect to Ms. Nabi's compensation, sufficient to comply with Item 402's extensive disclosure requirements and inform shareholders about the amount and nature of her remuneration. (Proxy at 29-49.) Plaintiff does not explain how a purportedly high *amount* of compensation makes the *disclosure of that amount* misleading or even confusing.[8] Rather, Plaintiff's claim impermissibly

---

[7]  Plaintiff does not "cite any other complaints regarding the adequacy of the CD & A disclosures" such as from other shareholders or from proxy advisory services. *Greenlight Cap., L.P. v. Apple, Inc.*, No. 13 Civ. 976 (RJS), 2013 WL 646547, at *12 n.8 (S.D.N.Y. Feb. 22, 2013).

[8]  Plaintiff asserts that "it is material to consider the amounts realized from the vesting of stock awards," (AC ¶ 19), but amounts realized from vesting are disclosed in the Proxy at page 60.

challenges the merits of Ms. Nabi's compensation instead of the Proxy's disclosure of information. However, "under Section 14(a), shareholders cannot recover for a breach of fiduciary duty; neither can they bootstrap such a claim into a federal securities action."  *Smykla*, 85 F.4th at 1237.

*Second*, the Amended Complaint inserts a block quote from page 40 of the Proxy, relating to employment agreements, and summarily claims that "[t]he foregoing fails to comply with the disclosure requirements of [Item 402(b)(1)(v) and (b)(2)(v)]" because it omits "how Coty determined th[e] amount" of Ms. Nabi's salary and omits the "specific items of corporate performance taken into account in deciding her salary."  (AC ¶ 20.)  However, page 40 of the Proxy is designed to comply with Item 402*(e)*, which requires disclosure of "[t]he material terms of each named executive officer's employment agreement or arrangement."   17 C.F.R. § 229.402(e)(1)(i).  That is exactly what the quoted disclosure does.  It is nonsensical to pull a section of the Proxy disclosing the terms of Ms. Nabi's employment agreement out of context and argue that it does not disclose information—unrelated to employment agreements—that is plainly stated elsewhere in the Proxy.  The Proxy discusses salary determinations and corporate performance:

> We pay base salaries to provide executives with a secure, fixed base of cash compensation in recognition of individual responsibilities and job performance . . . Salaries and any salary increases are approved by the RNC after a comparative analysis of base salaries for similar positions among the Compensation Peer Group. When determining base salaries, the RNC considers external competitive market conditions in addition to total direct compensation targets and personal performance and internal comparisons.

(Proxy at 32.)  In implicit recognition that the Proxy fully discloses Ms. Nabi's compensation, the Amended Complaint no longer seeks "[d]isclosure of the CEO's 2021-2023 compensation required in [Item 402]" in its demand for relief.  (*Compare* AC at 20 *with* ECF 1 at 14.)  Simply put, the Proxy's disclosures with respect to executive compensation are sufficient under Item

402(b) and applicable case law. *Greenlight Cap.*, 2013 WL 646547, at *11 ("[Item 402(b)] does not impose fiduciary duties or require certain methods for determining compensation").[9]

That the information is not duplicated in the employment agreement section of the Proxy from which Plaintiff selectively quotes does not render that section misleading or actionable. *Olkey v. Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2, 5 (2d Cir. 1996) (requiring SEC filings be read "as a whole"); *Furlong Fund*, 2016 WL 1181710, at *8 (finding that plaintiff's claimed omission was possible when "read in complete isolation" but "implausible when reading the Proxy Statement as a whole" and therefore rejecting the Section 14(a) claim because "[n]o reasonable shareholder" would draw plaintiff's proposed inference); *Bisel*, 2022 WL 4538173, at *10 (criticizing plaintiff for reading a "section of the Proxy entirely out of context" when the full section "spans tens of pages" and "explains in detail" the challenged topic).

*Third*, the Amended Complaint inserts another block quote, relating to Ms. Nabi's 2023 stock-based compensation, and alleges that it violates Items 402(b)(1)(v), (b)(2)(iii), (b)(2)(vi), (e), and (b)(2)(ix)-(x). (AC ¶ 21.) The Proxy, however, discloses all of the information required by those subsections including, respectively, that the method for establishing the value of long-term incentives (such as RSUs and PRSUs) involves "Compensation Peer Group analysis adjusted to reflect the total pool size and subjective review of NEO individual performance," (Proxy at 31), a list of the "several factors [considered] when determining long-term incentive awards," (*id.* at 34), (in the very text quoted) that the vesting of the PRSUs will be subject to discretion in that "the

---

[9]     Indeed, in *Greenlight Capital*, Plaintiff's counsel similarly challenged Apple's executive compensation disclosures, arguing that they violated Item 402(b) because they "fail[ed] to: identify the Compensation Committee's pertinent 'experiences' and 'assessment[s],' detail the 'input' provided by Apple CEO Cook, and explain the 'peer group data' used to determine RSU awards." *Id.* at *12. Then-District Judge Sullivan, however, "disagree[d], and f[ound] that the depth and breadth of information disclosed by Apple in the Proxy Statement [wa]s plainly sufficient under SEC rules." *Id.* Coty's Proxy similarly discloses the required information and more.

achievement of three-year performance objectives [will] be determined by the Board," (AC ¶ 21), that performance-based conditions will be determined by the Board, (*id.*), and prior long-term incentive award amounts, which are disclosed in the Summary Compensation Table (Proxy at 38). Plaintiff's counsel challenged Apple's stock-based compensation disclosures in *Greenlight* and therein "concede[d] that the SEC 'say-on-pay' rules do not require Apple to adopt a formula or rational method for determining executive pay." *Greenlight Cap.*, 2013 WL 646547, at \*13. That same concession is fatal to the claim here—Coty need not disclose (or even use) a specific formula or method to arrive at the numbers disclosed.

*Fourth*, Plaintiff cites a quote disclosing Ms. Nabi's 2023 PRSU award and alleges that it is misleading because it omits that "if fully realized, will result in [Ms. Nabi] acquiring 20,833,834 Coty shares of common stock" and that Ms. Nabi will receive "a performance-based cash bonus with an annual maximum payout of $6 million." (AC ¶ 23.) The full amounts of Ms. Nabi's stock awards were fully disclosed. Page 33 of the Proxy—the same page cited by Plaintiff—discloses that Ms. Nabi was granted 10,416,667 RSUs and 2,083,333 PRSUs in 2023 and will be granted 2,083,333 additional PSRUs in 2024, 2025, 2026 and 2027. 10,416,667 plus 2,083,333 (times 5) is 20,833,332. Reasonable shareholders are capable of doing that basic arithmetic. The fair value of the 2023 grant (*i.e.*, the RSUs and the first installment of the PSRUs) at the time of the grant amounted to $145,875,000, as disclosed in the Proxy's Summary Compensation Table and elsewhere. (Proxy at 38, 40, 47.) Page 33 of the Proxy also discloses Ms. Nabi's bonus under the section "Annual Bonus Plan" and states that it may range between 0% and 200% of Ms. Nabi's €3,000,000 salary, leading to the conclusion that the annual maximum payout is €6,000,000.

*Fifth*, Plaintiff alleges that the Proxy is misleading because "in establishing [Named Executive Officer] compensation it considers ten or eleven peer companies" but "only four U.S.

companies" and thus "[a] Coty stockholder would require [sic] to conduct substantial research to understand the relevance of the non-U.S. peers." (AC ¶ 25.) There is nothing false or misleading about using non-U.S. peer group companies and Plaintiff cites no authority stating otherwise. Indeed, Coty maintains major offices in Paris (where it is also listed) and Amsterdam (Proxy at 9), defines itself as a "*global* beauty powerhouse" (*id.* at 1) and, as discussed above, pays its CEO's annual salary and bonus in Euros (*id.* at 33). Plaintiff does not allege how "substantial research" would be required to understand the compensation disclosures of non-U.S. peer group executives, given that each company in the group publishes executive compensation information online and in English.

### C.      Plaintiff Cannot Establish Loss Causation As A Matter Of Law.

Plaintiff's failure to allege loss causation is an additional, independent basis for dismissing her Section 14(a) claim. A plaintiff in a Section 14(a) action must plead "loss causation, *i.e.*, that the subject of the fraudulent statement or omission was the cause of the actual loss suffered." *Rubenstein*, 2023 WL 6119810, at *2. "[B]oth loss causation and transaction causation must be proven in the context of a private action under § 14(a) of the 1934 Act and SEC Rule 14a-9 promulgated thereunder." *Grace v. Rosenstock*, 228 F.3d 40, 47 (2d Cir. 2000). "[T]ransaction causation [means] that but for the fraudulent statement or omission, the plaintiff would not have entered into the transaction; and loss causation [means] that the subject of the fraudulent statement or omission was the cause of the actual loss suffered." *Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 95 (2d Cir. 2001).

The Amended Complaint *admits* that the Proxy "did not cause economic loss." (AC ¶ 26.) This is fatal to the Section 14(a) claim. Plaintiff's assertion that "loss causation is not a requirement" is inconsistent with the Second Circuit's decision in *Rubenstein ex rel. Jefferies Fin. Grp. Inc. v. Adamany*, No. 22-2794, 2023 WL 6119810, at *2 (2d Cir. Sept. 19, 2023). In that

recent case, the Second Circuit explained: "Rubenstein's assertion that 'loss causation is sufficiently pled under Section 14(a) where a plaintiff alleges that misleading proxy statements were issued in connection with and led to the election of directors,' *is incorrect as a matter of law*." (emphasis added)); *see also Witchko ex rel. Am. Realty Cap. Props., Inc. v. Schorsch*, No. 15 Civ. 6043 (AKH), 2016 WL 3887289, at *7 (S.D.N.Y. June 9, 2016) (rejecting plaintiff's theory that the re-election of various directors via allegedly misleading proxy "was an essential causal link in their continued breaches of fiduciary duties" because "'the mere fact that omissions in proxy materials, by permitting directors to win re-election, indirectly lead to financial loss through mismanagement will not create a sufficient nexus with the alleged monetary loss.'" (quoting *Gen. Elec. Co. by Levit v. Cathcart*, 980 F.2d 927, 933 (3d Cir. 1992))).  Simply put, the "'tainted election' theory fails because [Plaintiff] does not plausibly allege that . . . financial harm . . . was caused," and admits that there was no harm.  *Rubenstein*, 2023 WL 6119810, at *4.[10]

That Plaintiff seeks injunctive relief does not dispense with the need to plead loss causation. *Id.* at *3 (noting that plaintiffs there sought both retrospective and prospective injunctive relief). Indeed, the Amended Complaint's demand for relief emphasizes why loss causation is a requirement in the first place.  Plaintiff wants this Court to *nullify the election of Coty's directors*. Defendants are unaware of any court taking such a drastic step in a Section 14(a) case.  *Cf. Silberstein v. Aetna, Inc.*, No. 13 Civ. 8759 (AJN), 2014 WL 1388790, at *7 (S.D.N.Y. Apr. 9, 2014) ("The Court acknowledges the possibility that even if retrospective relief—voiding any uninformed votes and requiring Aetna to resubmit the defeated proposals after providing

---

[10]  To the extent Plaintiff challenges the non-binding advisory say-on-pay vote, that too is precluded by *Rubenstein* for failure to plead loss causation.  *Rubenstein*, 2023 WL 6119810, at *3 n.4 ("[E]very federal court to address this issue has similarly concluded that Section 14(a) claims based on 'say-on-pay' proxy materials fail to adequately allege causation" (collecting cases)).

shareholders with complete and accurate information—is *possible*, it may not be *adequate*."); *Tully v. Mott Supermarkets, Inc.*, 337 F. Supp. 834, 852 (D.N.J. 1972) ("This Court will not declare invalid the May 24, 1971 election of directors and officers.  Such a rollback would undo a completed transaction, something this Court is seeking to minimize, as well as harm defendants without measurably aiding plaintiffs.")  Courts sparingly use the "extraordinary and drastic remedy" of equitable relief, especially when there is no loss.

## II.   PLAINTIFF'S PURPORTED DERIVATIVE CLAIM FOR BREACH OF FIDUCIARY DUTY SHOULD BE DISMISSED FOR FAILURE TO MAKE A DEMAND OR SUFFICIENTLY ALLEGE DEMAND FUTILITY.

For the reasons discussed below, the Court should dismiss Plaintiff's derivative claim due to the Amended Complaint's failure to establish demand futility.  *See Allred ex. Rel. Aclaris Therapeutics, Inc. v. Walker*, No. 19 Civ. 10641 (LJL), 2021 WL 5847405, at *4 (S.D.N.Y. Dec. 9, 2021) (demand futility is "a significant challenge under Delaware law which would have been applicable here to this Delaware corporation.").[11]

### A.   Rule 23.1 Legal Standard.

"A cardinal precept of the General Corporation Law of the State of Delaware is that directors, rather than shareholders, manage the business and affairs of the corporation."  *Aronson v. Lewis*, 473 A.2d 805, 811 (Del. 1984).  Accordingly, "[t]he decision whether to initiate or pursue a lawsuit on behalf of [a] corporation is generally within the power and responsibility of the board of directors."  *In re Citigroup Inc. S'holder Deriv. Litig.*, 964 A.2d 106, 120 & n.25 (Del. Ch. 2009) (citing Del. Code Ann. Tit. 8. § 141(a)); *Kernaghan v. Franklin*, No. 06 Civ. 1533 (LTS) (MHD), 2008 WL 4450268, at *3 (S.D.N.Y. Sept. 29, 2008) ("It is a long held principle of

---

[11]   "Although Rule 23.1 sets forth the pleading standard for federal court, the substance of the demand requirement is a function of state law—here, Delaware law."  *Espinoza ex rel. JPMorgan Chase & Co. v. Dimon*, 797 F.3d 229, 234 (2d Cir. 2015).

corporate law that directors manage the business of the corporation."). When a shareholder pursues a derivative action, she "displace[s] the board's authority" to manage corporate affairs. *In re EZCORP Inc. Consulting Agreement Deriv. Litig.*, 130 A.3d 934, 943 (Del. Ch. 2016).

It has long been the law in Delaware that "for a stockholder to divest the directors of their authority to control the litigation asset and bring a derivative action on behalf of the corporation, the stockholder must (1) make a demand on the company's board of directors or (2) show that demand would be futile." *Zuckerberg*, 262 A.3d at 1047 (quotations omitted). Thus, "[u]nder both Delaware law and Federal Rule of Civil Procedure 23.1," this Court will dismiss a derivative suit unless a plaintiff shows that a demand on the board would have been futile. *Binn v. Bernstein*, Civ. No. 19 Civ. 6122 (GHW) (SLC), 2020 WL 4550312, at *14 (S.D.N.Y. July 13, 2020), *report and recommendation adopted*, 2020 WL 4547167 (S.D.N.Y. Aug. 6, 2020).

To satisfy Rule 23.1's pleading requirements, the plaintiff "must comply with ***stringent*** requirements of factual particularity that differ substantially from . . . permissive notice pleadings." *Brehm v. Eisner*, 746 A.2d 244, 254 (Del. 2000) (emphasis added). "Under the heightened pleading requirements of Rule 23.1, 'conclusionary [sic] allegations of fact or law not supported by allegations of specific fact may not be taken as true.'" *Lebanon Cnty. Employees' Ret. Fund v. Collis*, 2022 WL 17841215, at *14 (Del. Ch. Dec. 22, 2022) (quotation omitted). Accordingly, courts in this District frequently dismiss derivative claims on a motion to dismiss under Rule 23.1's "stringent," heightened pleading standard. *See, e.g.*, *Pickett v. Gorevic*, No. 19 Civ. 5875 (GHW) (BCM), 2021 WL 4927061, at *12-13 (S.D.N.Y. Mar. 26, 2021), *report and recommendation adopted sub nom. Pickett v. Teladoc Health, Inc.*, 2021 WL 4239176 (S.D.N.Y. Sept. 17, 2021); *Brautigam v. Blankfein*, 8 F. Supp. 3d 395, 406 (S.D.N.Y. 2014), *aff'd sub nom. Brautigam v.*

16

*Dahlback,* 598 F. App'x. 53 (2d Cir. 2015); *F5 Cap. v. Pappas*, No. 14 Civ. 9356 (AT), 2016 WL 900389, at *7-9 (S.D.N.Y. Feb. 17, 2016), *aff'd*, 856 F.3d 61 (2d Cir. 2017).

Here, "Plaintiff made no pre-suit demand."  (AC ¶31.)  The operative question is thus whether "demand is excused because the directors are incapable of making an impartial decision regarding whether to institute such litigation."  *Stone v. Ritter*, 911 A.2d 362, 367 (Del. 2006).  To plead demand futility, Plaintiff must adequately allege that a majority of Coty's eleven directors: (1) received a material personal benefit from the alleged misconduct; (2) faced a substantial likelihood of liability on any of the claims that would be the subject of the litigation demand; or (3) lacked independence from someone who either received a material benefit from the alleged misconduct or faced a substantial likelihood of liability related to the litigation demand. *Zuckerberg*, 262 A.3d at 1059; *see Pierce v. Better Holdco, Inc.*, Civ. No. 22 Civ. 4748 (AT), 2023 WL 6386920, at *9 (S.D.N.Y. Sept. 29, 2023) (adopting *Zuckerberg* standard).  "Courts must ask these questions '***on a director-by-director basis***,' and only if the answer is yes to any of the three questions for at least half of the board would demand be excused as futile."  *Pierce*, 2023 WL 6386920, at *9 (emphasis added).

The eleven directors that would consider a demand are: Aramburuzabala, Ballini, Creus, Goudet, Harf, Huth, Makanju, Nabi, Parize, Rochet and Singer.  (AC ¶ 5.)  Plaintiff concedes that Creus, Goudet and Harf face no substantial likelihood of liability.  (*See* AC ¶ 32.)  For the remaining directors, Plaintiff contends that demand is excused on the ground that the directors face a substantial likelihood of liability.  (*See* AC ¶¶ 31-33.)  But "to establish that corporate directors face a substantial likelihood of personal liability . . ., the derivative plaintiff must plead particularized facts showing that they breached 'a non-exculpated duty.'"  *Pickett*, 2021 WL 4927061, at *11 (quotation omitted).

Derivative plaintiffs must plead non-exculpated claims because the Delaware General Assembly adopted Section 102(b)(7) of the DGCL to address "a directors and officers insurance liability crisis" by "permit[ting] stockholders to adopt a provision in the [charter] to free directors of personal liability in damages for due care violations." *Malpiede v. Townson*, 780 A.2d 1075, 1095 (Del. 2001). "Section 102(b)(7) is intended to encourage directors to pursue business strategies that may be risky but that hold the potential for value maximization. Thus, as long as the directors['] efforts to pursue such strategies are made in good faith, their actions are protected by section 102(b)(7)." *In re Trinsum Grp., Inc.*, 466 B.R. 596, 612 (Bankr. S.D.N.Y. 2012) (citation omitted).

It is undisputed that Coty's charter includes a Section 102(b)(7) exculpatory provision:

> No director shall be personally liable to the Corporation or any of its stockholders for monetary damages for breach of fiduciary duty as a director, except to the extent such exemption from liability or limitation is not permitted under the GCL as the same exists or may hereafter be amended. If the GCL is amended hereafter to authorize the further elimination or limitation of the liability of directors, then the liability of a director of the Corporation shall be eliminated or limited to the fullest extent authorized by the GCL, as so amended.

(Charter at 11.)[12] Accordingly, Coty's charter immunizes the Board from liability for breaches of their duty of care, *i.e.*, exculpated claims.

Section 102(b)(7) of the DGCL provides that *non*-exculpated director or officer claims include "acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law." 8 *Del. C.* § 102(b)(7)(ii). Thus, to state a claim against Defendants in the face of Coty's exculpatory charter provision, Plaintiff must allege "facts supporting a rational inference that the director harbored self-interest adverse to the stockholders' interests . . . or acted in bad

---

[12] The Court "may take judicial notice of a certificate of incorporation [or corporate charter] on a motion to dismiss." *Staehr v. Mack*, No. 07 Civ. 10368 (DAB) 2011 WL 1330856, at *6 n.5 (S.D.N.Y. Mar. 31, 2011). Coty's Charter is attached as Exhibit F to the Musoff Declaration.

faith." *In re Cornerstone Therapeutics Inc., S'holder Litig.*, 115 A.3d 1173, 1179-80 (Del. 2015); *see Louisiana Mun. Police Employees Ret. Sys. v. Pandit*, No. 08 Civ. 7389 (LTS), 2009 WL 2902587, at *7 n.5 (S.D.N.Y. Sept. 10, 2009) (plaintiff must "proffer sufficient particularized allegations of non-exculpated conduct—bad faith, intentional misconduct, disloyalty, etc.—to indicate substantial risk of director personal liability notwithstanding this exculpatory provision.").

Plaintiff relies on just the single theory of "bad faith" to negate exculpation, attempting to create a reasonable inference that eight of Coty's eleven directors acted in "bad faith" in approving Ms. Nabi's executive compensation.  (AC ¶¶18, 33.)  As demonstrated below, Plaintiff fails to plead particularized facts, on a director-by-director basis, proving a substantial likelihood of liability for bad faith.  *See Pierce*, 2023 WL 6386920, at *9.  Accordingly, Plaintiff has not shown that demand is futile and Plaintiff's breach of fiduciary claim should be dismissed.

### B. The Amended Complaint Fails To Allege Facts Sufficient To Demonstrate A Substantial Likelihood Of Liability.

Plaintiff argues that eight of Coty's eleven directors face a substantial likelihood of liability because they breached their fiduciary duties by "act[ing] in bad faith in approving" Ms. Nabi's compensation (AC ¶33), which constitutes "waste[] and ridiculous excess."  (*Id*. ¶18.)  These conclusory allegations fail to establish demand futility.

The "standards for corporate waste and bad faith by the board are similar."  *White v. Panic*, 783 A.2d 543, 554 n.36 (Del. 2001); *see Pickett*, 2021 WL 4927061, at *13 (adopting *White's* standards).  Under either theory, "the plaintiff must overcome the general presumption of good faith by showing that the board's decision was so egregious or irrational that it could not have been based on a valid assessment of the corporation's best interests."  *White*, 783 A.2d at 554 n.36.  The Delaware Court of Chancery has explained that this "stringent" standard is "difficult for any plaintiff to meet."  *Citigroup*, 964 A.2d at 136; *see Kates v. Beard Rsch., Inc.*, 2010 WL 1644176,

at *5 (Del. Ch. Apr. 23, 2010) ("Delaware courts have described the standard for corporate waste as onerous, stringent, extremely high, and very rarely satisfied."). "In short, it takes an ***extreme factual scenario*** for a plaintiff to state a claim for bad faith or waste." *Feuer ex. rel. CBS Corp. v. Redstone*, 2018 WL 1870074, at *10 (Del. Ch. Apr. 19, 2018) (emphasis added).

Under Delaware law, it also takes an especially extreme factual scenario for a derivative plaintiff to plead a claim for bad faith or waste concerning executive compensation. Allegations that compensation is "excessive or even lavish" are "insufficient as a matter of law." *In re 3COM Corp. S'holders Litig.*, 1999 WL 1009210, at *4-5 (Del. Ch. Oct. 25, 1999). Thus, a board's decision "is entitled to great deference" under "the stringent requirements of the waste test." *Brehm*, 746 A.2d at 263. "The decision as to how much compensation is appropriate . . . is a core function of a board of directors." *In re Goldman Sachs Grp., Inc. S'holder Litig.*, 2011 WL 4826104, at *14 (Del. Ch. Oct. 12, 2011). "It is the essence of business judgment for a board to determine if a particular individual warrant[s] large amounts of money, whether in the form of current salary or severance provisions." *Brehm*, 746 A.2d at 263 (internal quotations omitted; alteration in original); *see id.* ("the size and structure of executive compensation are inherently matters of judgment"). Courts have even recognized that "'the size of executive compensation for a large public company in the current environment often involves large numbers.'" *Zucker v. Andreessen*, 2012 WL 2366448, at *10 (Del. Ch. June 21, 2012) (quotations omitted). Accordingly, "[s]hort of 'unconscionable cases,' Delaware law demands that the courts, which are 'ill-fitted to attempt to weigh the 'adequacy' of consideration,' refrain from second-guessing the wisdom of executive compensation contracts, even if, in retrospect, they appear disadvantageous." *Pickett*, 2021 WL 4927061, at *13 (quoting *Feuer*, 2018 WL 1870074, at *10).

Under this legal framework, it is unsurprising that the vast majority of derivative claims challenging executive compensation under Delaware law are dismissed at the pleadings stage. *See, e.g.*, *Pickett*, 2021 WL 4927061, at *12-17 (dismissing derivative waste claim challenging executive's amended employment and separation agreements); *In re Am. Int'l Grp., Inc. Derivative Litig.*, 700 F. Supp. 2d 419, 443-45 (S.D.N.Y. 2010) (dismissing derivative waste claims challenging three executive compensation packages), *aff'd*, 415 F. App'x. 285 (2d Cir. 2011); *Shaev v. Adkerson*, 2015 WL 5882942, at *9 (Del. Ch. Oct. 5, 2015) (dismissing derivative waste claim against directors for allegedly acting in bad faith in approving grant of RSUs to company's CEO); *Zucker*, 2012 WL 2366448, at *10 (dismissing derivative waste claim where board agreed to an executive agreement that "may appear extremely rich or altogether distasteful to some" because "the Board's decision on the amount of severance it would agree to pay [then-CEO] was the product of a valid exercise of business judgment"); *Seinfeld v. Slager*, 2012 WL 2501105, at *6-7 (Del. Ch. June 29, 2012) (dismissing derivative waste claim involving an employment agreement with CEO that provided allegedly excessive benefits because "[e]mployment compensation decisions are core functions of a board of directors, and are protected, appropriately, by the business judgment rule"). Here, the Amended Complaint fails to satisfy its heavy pleading burden for at least the following reasons.

*First*, Plaintiff principally challenges Ms. Nabi's 2021 to 2023 executive compensation as "irrationally excessive." (AC ¶33.) But simply labeling Ms. Nabi's compensation as "excessive or even lavish" is "insufficient as a matter of law to meet the standard required for a claim of waste." *3COM*, 1999 WL 1009210, at *4-5; *see Kandell ex. rel. FXCM, Inc. v. Niv*, 2017 WL 4334149, at *15 (Del. Ch. Sept. 29, 2017) (dismissing derivative waste claims challenging excessive compensation); *Espinoza v. Zuckerberg*, 124 A.3d 47, 67 (Del. Ch. 2015) (same).

Ms. Nabi's compensation package for 2021 to 2023 is substantial, but that is a classic business judgment, especially when a company seeks to hire a sought-after CEO candidate.  *See In re Walt Disney Co. Derivative Litig.*, 731 A.2d 342, 362 (Del. Ch. 1998) (dismissing derivative waste claim where board offered CEO "a highly attractive compensation package" to attract CEO to Disney), *aff'd in part, rev'd in part and remanded sub nom. Brehm*, 746 A.2d 244.  In early September 2020, Coty's stock price was trading below $4 per share—down nearly 2.5x from its stock price just a year beforehand.  During this tumultuous time, "the Board was mindful of the significant challenges facing the Company and the need [to] recruit a CEO with the vision and skills needed to achieve the transformation goals and to drive the Company's performance to a sustained level."  (2021 Proxy at 35.)  The Board thus hired Ms. Nabi as CEO in July 2020 "based in large measure on competitive benchmarking and her experience levels, industry expertise and her expected future contributions to the Company's transformation."  (*Id.*)

"[T]o align Ms. Nabi's interests with those of [Coty's] shareholders and to motivate her stewardship of the Company's strategy over the longer-term, the Board approved a one-time sign-on award of 30,000,000 RSUs."  (*Id.*)  ***Notably***, this alignment of incentives meant that Ms. Nabi would be paid less if Coty performed poorly and attracting her to the Company therefore required her stock grant to be significant.  Moreover, Coty's majority shareholder agreed "to transfer one-half of the total number of shares of Class A Common Stock owed to [Ms. Nabi] if and when the RSU award vests . . . to mitigate the dilutive impact of the award."  (*Id.*)  These shares vested as scheduled.  (2022 Proxy at 18; Proxy at 19.)  This contribution not only evinces the majority shareholder's well-founded confidence that Ms. Nabi could steer the Company through troubled waters, but reduces any financial impact to Coty's shareholders via dilution.  Moreover, Coty's shareholders supported the executive compensation program, as 77.4% of votes cast were in favor

of the "say-on-pay" advisory shareholder vote.  (Musoff Decl., Ex. G, Coty Form 8-K, filed Nov. 10, 2021, at 2.)

Ms. Nabi's compensation has ultimately been substantial as a result of, as the Board anticipated, her "contributions to the Company's transformation."  Ms. Nabi's RSU "award vests and settled in 10,000,000 shares of the Company's Class A Common Stock on each vesting date of August 31, 2021, August 31, 2022 and August 31, 2023."  (2023 Proxy at 47.)  Due to Coty's recent growth, its stock price on these three days, respectively, was $9.88, $7.51, and $11.56, each significantly higher than the stock price at the time of Ms. Nabi's hire.  Accordingly, the Board's good faith decision to award Ms. Nabi her executive compensation package "is entitled to great deference" under "the stringent requirements of the waste test."  *Brehm*, 746 A.2d at 263.  This is especially true where the Board has also (i) modeled its executive compensation packages against an exhaustive "Compensation Peer Group" and (ii) "engaged independent external experts to provide information with respect to our executive compensation."  (Proxy at 36-37.)  The Board's well-reasoned and supported executive compensation decision clearly falls "[s]hort of [an] 'unconscionable case[].'"  *Pickett*, 2021 WL 4927061, at *13.

*Second*, Plaintiff argues that the Board "authorized [Ms. Nabi's compensation] for reasons other than Coty's best interests" and thus "the only possible conclusion is that the directors acted in bad faith."  (AC ¶33.)  This is incorrect.  "'So long as there is some rational basis for directors to conclude that the amount and form of compensation is appropriate and likely to be beneficial to the corporation, the grant will not constitute waste.'"  *Kandell*, 2017 WL 4334149, at *15 (citation omitted).  Here, the Proxy explains the Board's rational bases (in addition to the reasons previously stated) for providing Ms. Nabi and other key executive officers their compensation packages:

> [W]e have focused our compensation program for NEOs on long-term incentives in order to align our executives' interests with stockholder interests and to foster an ownership culture among our Executive Committee members. The RNC believes that these officers have the greatest role in establishing the Company's direction and therefore should have the greatest proportion of their compensation aligned with the long-term interests of shareholders. . . . The Company believes that the compensation program plays a key role in providing the appropriate incentives to drive success, which in turn, should help drive improved operating and financial results reflected in improved total stockholder return.

(Proxy at 29-31.) These well-reasoned explanations establish that the decision to grant Ms. Nabi her compensation package was not "so egregious or irrational that it could not have been based on a valid assessment of the corporation's best interests." *White*, 783 A.2d at 554 n.36.

*Finally*, Plaintiff argues that "[t]he amount of [] Nabi's remuneration is unreasonable under Delaware law, when measured against Coty's size, its success, and the remuneration of its other officers." (AC ¶24.) But again, it is well within the Board's business judgment to determine that Ms. Nabi, as Coty's top executive, is entitled to receive large and "Unique CEO Compensation Arrangements," which are explained in exhaustive detail in the Proxy (*see* Proxy at 30-38). *See Brehm*, 746 A.2d at 263. Furthermore, under Delaware law the *opposite* of Plaintiff's position is true: the size and structure of executive compensation for a large public company such as Coty often is substantial, supporting the business judgment of the Board to award Ms. Nabi significant compensation. *See Zucker*, 2012 WL 2366448, at *10 (citation omitted). Plaintiff concedes Coty is a large public company: "For 2023 and 2022, Coty's total assets were $12 billion." (AC ¶ 24.)

Moreover, Ms. Nabi's compensation as compared to "her peers" or "Coty's other NEOs" is inconsequential as a matter of law. (AC ¶33.) "'[A]mount alone is not the most salient aspect'" of compensation in a waste analysis. *Zucker*, 2012 WL 2366448, at *10 (citation omitted). Thus, "if a 'particular individual warrant[s] large amounts of money, whether in the form of current salary or severance provisions, the board has made a business judgment.'" *Disney*, 731 A.2d at 362 (citation omitted); *see id.* at 350 ("Nature does not sink a ship merely because of its size….").

The Board exercised its business judgment in awarding Ms. Nabi her compensation package, regardless of how Ms. Nabi's pay compares to peer CEOs or other Coty executive officers.

## III.   PLAINTIFF'S PURPORTED DERIVATIVE CLAIM FOR BREACH OF FIDUCIARY DUTY ALSO FAILS TO STATE A CLAIM UNDER RULE 12(B)(6).

Plaintiff fails to plead non-conclusory facts that, if true, would establish her derivative claim for breach of fiduciary duty under Rule 12(b)(6).  To state a claim, Plaintiff must allege that Defendants engaged in conduct that is not immunized by the exculpatory provision of Coty's charter.  *See McMillan*, *v. Intercargo Corp.*, 768 A.2d 492, 495-96 (Del. Ch. 2000).  For the same reasons that Plaintiff has not demonstrated a substantial likelihood of liability with respect to any Defendant, Plaintiff has failed to allege a valid claim for breach of fiduciary duty.

## CONCLUSION

For the foregoing reasons, the Amended Complaint should be dismissed in its entirety with prejudice pursuant to Federal Rules of Civil Procedure 9(b), 12(b)(6) and 23.1 and the PSLRA.

Dated: New York, New York
　　　 December 22, 2023

　　　　　　　　　　　　　　　　/s/ Scott D. Musoff＿＿＿＿＿＿＿＿
　　　　　　　　　　　　　　　　Scott D. Musoff
　　　　　　　　　　　　　　　　Lauren E. Aguiar
　　　　　　　　　　　　　　　　SKADDEN, ARPS, SLATE,
　　　　　　　　　　　　　　　　　 MEAGHER & FLOM LLP
　　　　　　　　　　　　　　　　One Manhattan West
　　　　　　　　　　　　　　　　New York, New York 10001
　　　　　　　　　　　　　　　　Telephone: (212) 735-3000
　　　　　　　　　　　　　　　　Facsimile: (212) 735-2000
　　　　　　　　　　　　　　　　scott.musoff@skadden.com
　　　　　　　　　　　　　　　　lauren.aguiar@skadden.com

Paul J. Lockwood
(*pro hac vice* forthcoming)
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
One Rodney Square
920 N. King Street
Wilmington, Delaware 19801
Telephone: (302) 651-3000
Facsimile: (302) 651-3005
paul.lockwood@skadden.com

*Attorneys for Defendants Coty Inc., Maria Asuncion Aramburuzabala Larregui, Beatrice Ballini, Joachim Creus, Olivier Goudet, Peter Harf, Johannes P. Huth, Anna Adeola Makanju, Sue Nabi, Isabelle Parize, Lubomira Rochet and Robert Singer*

26